IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PACIFIC COMMUNITY RESOURCE
CENTER et al.,

        Plaintiffs,

        v.

CITY OF GLENDALE, OREGON et al.,

        Defendants.

Civ. No. 6:13-cv-01272-MC

AMENDED
OPINION AND ORDER

_____

MCSHANE, Judge:

      Plaintiff Pacific Community Resource Center (PCRC) is a registered non-profit organization purporting to provide housing to disabled and other low income individuals. PCRC, along with former and current tenants,[1] bring this action seeking equitable relief and damages for alleged violation of the Fair Housing Act, as amended by the Fair Housing Amendments Act of 1988 (FHA), 42 U.S.C. § 3601 *et seq.*, the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and ORS § 659A.145. Plaintiffs filed this second motion for preliminary injunctive relief (#37).[2] This Court has jurisdiction under 28 U.S.C. § 1331. Upon review, plaintiffs' motion for preliminary injunctive relief (#37) is DENIED.

## PROCEDURAL AND FACTUAL BACKGROUND

---

[1] Michael Cassidy, Art Corbett, Becky Corbett and David Rothenberg are current tenants. Second Am. Compl. ¶¶ 11–13, 16, ECF No. 35. Don Billings and Darlene Billings are former tenants. *Id.* at ¶¶ 14–15.

[2] This Court denied plaintiff Michael Cassidy's initial motion for preliminary injunctive relief on October 23, 2013. Op. & Order 1–5, Oct. 23, 2013, ECF No. 31.

1 – OPINION AND ORDER

Plaintiffs' claims arise out of alleged FHA, 42 U.S.C. § 3601 *et seq.*, Fourteenth Amendment, 42 U.S.C. § 1983, and ORS § 659A.145 violations. All five claims are based on the City of Glendale's alleged discriminatory enforcement of the city's Certificate of Occupancy (COO) requirements and Glendale Municipal Ordinance (GMO) 03-2012.

Beginning in October 2009, PCRC entered into a commercial real estate agreement with Cow Creek Properties, LLC (Cow Creek) for a sixteen-unit motel located in Glendale's commercial zone. Second Am. Compl. ¶¶ 29, 68, ECF No. 35. Shortly thereafter, plaintiffs Cassidy and PCRC attended a City Council meeting and obtained permission to rent "rooms in the old motel to small businesses." Mem. in Supp. Defs.' Resp. to Pls.' Second Mot. Prelim. Inj. 2, ECF No. 47.

On September 12, 2012, Cassidy attended a City Council meeting and requested to change the use of the motel property to include residential tenants. Second Am. Compl. ¶ 39, ECF No. 35. Plaintiffs allege that in response, City Council members stated, "that's not going to happen, we don't want those kind of people in our town." [3] *Id.* at ¶ 40. On October 20, PCRC sought documentation from the City Council relating to the motel's prior use, building permits, conditional use permits, and zoning amendments. *Id.* at ¶ 41.

The following day, October 21, 2011, Glendale sent a letter to PCRC indicating that PCRC was in potential violation of residential use in the commercial zone. *Id.* at ¶ 42. Upon receipt of this notification, PCRC communicated with the City Council multiple times to discuss zoning compliance alternatives (October 24, 2011; November 14, 2011; November 25, 2011; and

---

[3] Plaintiffs' allege that similar comments were made on October 21, 2011 and October 24, 2011. Second Am. Compl. ¶¶ 44, 47, ECF No. 35. Plaintiffs also allege that council member Eels stated "[plaintiff Cassidy] is like the illegal Mexicans coming over the border" during a City Council workshop meeting on June 25, 2012. *Id.* at 59. In contrast, defendants' allege that the City Council did not "sign off" on any change of use at the motel property because plaintiffs "fail[ed] to provide the plans and other documentation necessary." Mem. in Supp. Defs.' Resp. to Pls.' Second Mot. Prelim. Inj. 3, ECF No. 47.

2 – OPINION AND ORDER

November 28, 2011). *Id*. at ¶¶ 48, 50, 52, 54–55. However, Glendale and PCRC were unable to reach an agreement.

On December 3, 2011, plaintiff Cassidy received notice for a "11/28/11 zoning ordinance violation" from Glendale. *Id*. at ¶ 57. Plaintiff Cassidy contested this violation, but was ultimately convicted at trial before a circuit court judge on or about May 10, 2012, for operating without having received and obtained an R-2 Certificate of Occupancy or a Conditional Use Permit.[4] Mem. in Supp. Defs.' Resp. to Pls.' Second Mot. Prelim. Inj. 4, ECF No. 47.

In an effort to obtain a R-2 Certificate of Occupancy, PCRC initiated a series of inspections with the State Fire Marshall. The first inspection (February 24, 2012), resulted in a report identifying eleven deficiencies. Second Am. Compl. ¶¶ 71–73, ECF No. 35. A subsequent inspection on May 10, 2012, resulted in a report showing that ten deficiencies were resolved and that the only remaining deficiency "was failure to obtain a certificate of occupancy." *Id*. at ¶ 79. On May 11, 2012, PCRC approached Glendale to acquire a COO sign-off.[5] Glendale officials refused to provide plaintiffs with this sign-off.[6] As a result, Douglas County did not issue the R-2 COO to plaintiffs.

On April 9, 2012, during plaintiffs' pursuit of the R-2 COO, the Glendale City Council unanimously adopted GMO 03-2012. *Id*. at ¶ 60. GMO 03-2012 amended GMO 01-2005 and removed "multi-family housing from the permitted" uses in the commercial zone. *Id*. at ¶ 61. Plaintiffs unsuccessfully challenged the removal of "multi-family housing" under GMO 03-2012

---

[4] Plaintiff Cassidy was convicted a second time for zoning violations. Although unclear from the record, the second conviction occurred on or after November 30, 2012. Second Am. Compl. ¶ 108, ECF No. 35.

[5] Although Douglas County actually issues the COO, an applicant need first acquire a "sign-off," i.e., a "form signed off on by the City stating that all of the City Ordinances have been complied with." Mem. in Supp. Defs.' Resp. to Pls.' Second Mot. Prelim. Inj. 5, ECF No. 47.

[6] Plaintiffs allege that City Manager Stanfill stated "it is not a city issue, both the R-1 to R-2 and Occupancy permit are a Douglas County concern. Talk to them, not us." Second Am. Compl. ¶ 81, ECF No. 35. Likewise, plaintiffs claim to have mailed a written request for a "sign-off" on June 22, 2012, *id*. at ¶ 85, and on December 17 and 20, 2012, *id*. at ¶ 110.

through the Land Use Board of Appeals. *See Cassidy v. City of Glendale*, OR. LAND USE BD. OF APP. No. 2012-033 (Oct. 10, 2012), *available at*

http://www.oregon.gov/luba/pages/2012opinions.aspx.

Between May 11, 2012, and January 21, 2013, plaintiffs unsuccessfully sought a COO through Douglas County. *See* Second Am. Compl. ¶¶ 80–118, ECF No. 35; *see also supra* note 6. On January 21, 2013, Glendale issued plaintiffs a notice of building code civil penalty for violation of Oregon Structural Specialty Code (OSSC) § 111.1 Use and occupancy.[7] *Id*. at ¶ 119. On August 22, 2013, Cow Creek received an invoice stating the civil penalties balance amounted to $30,000. *Id*. at ¶ 134. By September 16, 2013, this balance had increased to $65,000. Pls.' Mot. Expedited Hr'g and Prelim. Inj. 2, ECF No. 22. To date, plaintiffs continue to operate the motel for residential uses and defendants continue to levy civil penalties against the property. Plaintiffs now seek immediate injunctive relief to maintain the status quo and stop any future foreclosure or eviction action. Mem. in Supp. Pls.' Second Mo. Prelim. Inj. 4, 8, ECF No. 38.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction the moving party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "In other words, 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can

---

[7] OSSC § 111.1 states "… no change in the … use or occupancy classification of a building or structure … until the building official has issued a certificate of occupancy for such change in character, use or occupancy therefore as provided herein." 2010 OREGON STRUCTURAL SPECIALTY CODE, *available at* http://ecodes.biz/ecodes_support/free_resources/Oregon/10_Structural/10_PDFs/Chapter%201_Scope%20and%20Administration.pdf.

4 – OPINION AND ORDER

support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also M.R. v. Dreyfus*, 697 F.3d 706, 726 (9th Cir. 2011) (reversing district court decision for denying preliminary injunction motion under standard articulated in *Cottrell*).[8]

## DISCUSSION

Plaintiffs assert multiple constitutional and statutory violations.[9] Of those asserted, plaintiffs only articulate in their motion (#37) an argument under the FHA, 42 U.S.C. § 3601 *et seq*. Accordingly, this Court's inquiry will focus on plaintiffs' claims under the FHA, 42 U.S.C. § 3601 *et seq*.[10]

### I. FHA, 42 U.S.C. § 3601 *et seq*.

"The FHA forbids discrimination in the sale or rental of housing, which includes making unavailable or denying a dwelling to a buyer or renter because of a handicap," *Budnick v. Town of Carefree*, 518 F.3d 1109, 1113 (9th Cir. 2008) (citations omitted) (internal quotation marks omitted), or any person because of "race, color . . . or national origin," 42 U.S.C. § 3604(a). It is "well established that zoning practices that discriminate against disabled individuals can be discriminatory and therefore violate § 3604." *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 (9th Cir. 2013) (citing *City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 803–804 (9th Cir. 1994)); *see also Town of Huntington, N.Y. v.*

---

[8] Importantly, at oral argument, plaintiffs' counsel conceded that plaintiffs did not meet the "likelihood of success" standard articulated in *Winter* absent interpretation through *Cottrell*.

[9] Plaintiffs assert discrimination and retaliation claims under the FHA, 42 U.S.C. § 3601 *et seq*., a "substantive due process" claim under the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, a discrimination claim under the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and a reasonable accommodation claim under ORS § 659A.145. Second Am. Compl. ¶¶ 140–67, ECF No. 35.

[10] To the extent that plaintiffs implicitly rely upon other filings to argue for preliminary injunctive relief under the Fourteenth Amendment or ORS § 659A.145, this Court DENIES the motion consistent with its previous opinion issued October 23, 2013. *See* Opinion and Order 1–5, Oct. 23, 2014, ECF No. 31.

5 – OPINION AND ORDER

*Huntington Branch, N.A.A.C.P.*, 488 U.S. 15, 18 (1988) (holding that zoning practices that discriminate against racial minorities can violate the FHA).

Plaintiffs generally allege that the defendants selectively enforced zoning ordinances to prevent "disabled and Native Americans from obtaining housing in Glendale, Oregon." Mem. in Supp. Pls.' Second Mo. Prelim. Inj. 6, ECF No. 38. This Court now turns to *Winter* and *Cottrell* to assess plaintiffs' motion for preliminary injunctive relief.

## A. Likelihood of Success on the Merits

Plaintiffs generally allege that they are "likely to succeed on the merits of their Fair Housing Act Claims." Mem. in Supp. Pls.' Second Mo. Prelim. Inj. 5, ECF No. 38. In support of this contention, plaintiffs focus on disparate impact[11]—"only one of the other 35 similarly situated buildings in the [commercial zone] . . . obtained a certificate of occupancy." *Id*. at 6. This core allegation is supported by statistical evidence briefly laid out in plaintiffs' second amended complaint.[12]

"As a general matter, FHA claims are evaluated under the burden-shifting framework of the Title VII discrimination analysis and may be brought under theories of both disparate treatment and disparate impact."[13] *Comm. Concerning Cmty. Improvement v. City of Modesto*,

---

[11] Disparate impact is defined as "[t]he adverse effect of a facially neutral practice that nonetheless discriminates against persons because of their [protected status]. Discriminatory intent is irrelevant in a disparate-impact claim." Black's Law Dictionary 538 (9th ed. 2009). In contrast, disparate treatment is defined as "[t]he practice . . . of intentionally dealing with persons differently because of their [protected status]. To succeed on a disparate-treatment claim, the plaintiff must prove that the defendant acted with discriminatory intent or motive." *Id*. This Court focuses on plaintiffs' disparate impact claim because plaintiffs make no explicit argument as to disparate treatment in their motion. To the extent that plaintiffs implicitly argue under disparate treatment, this Court is unable to find, based upon the facts provided, that plaintiffs have raised "serious questions going to the merits."

[12] Plaintiffs' pleadings cite a 2011 U.S. Census indicating that up to 1.4 percent of the city population was American Indian (including mixed race). Second Am. Compl. ¶ 30, ECF No. 35. In other words, approximately 12 persons were, in part, American Indian. Importantly, three plaintiffs are American Indian. *Id*. at ¶¶ 12, 14–15. Plaintiffs do not provide any statistical evidence as to the number of disabled persons in the community.

[13] Importantly, a plaintiff need not use the *McDonnell Douglas* test and "may 'simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated' the defendant and that the defendant's actions adversely affected the party in some way." *Pacific Shores Properties, LLC*, 730

583 U.S. 690, 711 (9th Cir. 2009) (citations omitted). "To establish a prima facie case of disparate impact under the FHA, 'a plaintiff must show at least that the defendant's actions had a discriminatory effect.'"[14] *Id*. (quoting *Pfaff v. United States Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 (9th Cir. 1996)). "'Discriminatory effect' describes conduct that actually or predictably resulted in discrimination." *Id*. (citations omitted). "To establish a prima facie case of discrimination without intent, the charging party must 'prove the discriminatory impact at issue; raising an inference of discriminatory impact is insufficient.'" *Pfaff*, 88 F.3d at 746 (internal quotation marks omitted) (citations omitted). This discriminatory impact need be "a significantly adverse or disproportionate impact on persons of a particular [type] produced by the [defendant's] facially neutral acts or practices." *Comm. Concerning Cmty. Improvement*, 583 F.3d at 711 (citations omitted) (internal quotation marks omitted).

Assuming plaintiffs are able to meet this initial prima facie burden,[15] "defendant[s] may then rebut [plaintiffs'] proof of disparate impact by 'supply[ing] a legally sufficient, nondiscriminatory reason.'" *Id*. (quoting *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194 (9th Cir. 2006)). To make this showing, defendants must "show that [the alleged violative ordinance] had a nondiscriminatory, 'legitimate, bona fide governmental interest.'"

---

F.3d at 1158 (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)). Under the direct or circumstantial evidence approach, this Court analyzes whether the defendant's actions were motivated by a discriminatory purpose by examining "(1) statistics demonstrating a 'clear pattern unexplainable on grounds other than discriminatory ones, (2) [t]he historical background of the decision, (3) the specific sequence of events leading up to the challenged decision, (3) [t]he specific sequence of events leading up to the challenged decision, (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant legislative or administrative history." *Id*. at 1158–59 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977)) (internal quotation marks omitted).

[14] Plaintiffs' prima facie case of disparate impact does not require evidence of discriminatory intent. *See, e.g.*, *Pfaff*, 88 F.3d at 745–46 (citing *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217 (2d Cir.1987)).

[15] This Court reserves judgment as to plaintiffs' prima facie burden. However, this Court notes that plaintiffs have not set forth sufficient statistical evidence as to underlying allegations of FHA disability disparate impact to justify preliminary injunctive relief. *See, e.g.*, *Budnick*, 518 F.3d at 1118 (citations omitted) ("We have previously recognized the necessity of statistical evidence in disparate impact cases.").

7 – OPINION AND ORDER

*Affordable Hous. Dev. Corp.*, 433 F.3d at 1195 (citations omitted); *see also Huntington Branch, N.A.A.C.P.*, 488 U.S. at 17 (recognizing the defense of "a legitimate, bona fide governmental interest."); *Pfaff*, 88 F.3d at 746–47 (indicating that the "appropriate standard of rebuttal in disparate impact cases normally requires a compelling business necessity.").

Defendants' rebuttal, at least at this point, focuses on plaintiffs' alleged procedural deficiencies and defendants' general ideas of governance.[16] Specifically, defendants' argue that plaintiffs' failed to comply with GMO engineering plan and documentation requirements. This compliance failure precluded plaintiffs from being "grandfathered in"[17] under GMO 03-2012 which removed "multi-family housing from the permitted" uses in the commercial zone.

Upon review of the evidence presented, this Court is unable to find that plaintiffs are likely to succeed on the merits. *See also supra* note 15. Plaintiffs have only offered an inference of discriminatory impact. Plaintiffs' strongest claim, disparate impact on the American Indian community of Glendale, is insufficient. Two of the three Native American tenants (Don Billings and Darlene Billings) were able to relocate during the course of litigation. Second Am. Compl. ¶¶ 14–15, ECF No. 35. Likewise, plaintiffs provide little evidence that they actually complied with GMO engineering plan and documentation requirements. *See, e.g.*, *id.* at ¶¶ 71–79, 84. Accordingly, this Court, at this point in time, is unable to find "serious questions going to the merits."

---

[16] Defendants briefly discuss Glendale's interest in "maintaining that area in Glendale for commercial use." Mem. in Supp. Defs.' Resp. to Pls.' Second Mot. Prelim. Inj. 10, ECF No. 47. Notably, "[a] town's preference to maintain a particular zoning category for particular sections of the community is normally based on a variety of circumstances." *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 936 (2d Cir. 1988), aff'd in part, 488 U.S. 15 (1988). Likewise, "a town's interests in zoning requirements are substantial." *Id.* at 937 (citations omitted). However, this Court still generally "has an obligation to assess whatever justifications the town advances and weigh them carefully against the degree of adverse effect the plaintiff has shown." *Id.* at 937.

[17] In contrast, the Carlillie Apartments, located at 552 Pacific Ave., is a "grandfathered in" multi-family housing unit located within the commercial zone that does not have a certificate of occupancy on file. However, plaintiffs provided little indication of the nature of Carlillie residents.

### B. Balance of Hardships

"In assessing whether the plaintiffs have met this burden, [this Court] has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)). In weighing the harms, this Court focuses on the "harms to the individual" parties. *Id*.

Plaintiffs identify two primary harms: plaintiffs' property interest in the motel and the loss of housing following foreclosure and subsequent eviction.[18] Mem. in Supp. Pls.' Second Mo. Prelim. Inj. 7, ECF No. 38. In response, defendants' argue that plaintiffs' alleged harm is purely speculative. Mem. in Supp. Defs.' Resp. to Pls.' Second Mot. Prelim. Inj. 9, ECF No. 47. At the current date, Glendale has not initiated foreclosure proceedings. Likewise, of the six plaintiff tenants, two were already able to find housing alternatives during the course of this litigation. As a result, these facts, when combined, indicate that the hardship balance does not tip sharply toward the plaintiffs. Thus, plaintiffs do not meet their burden under *Cottrell*.

### C. Public Interest

Under *Winter*, plaintiffs must show that an injunction is in the public interest. 555 U.S. at 20. Plaintiffs argue that an injunction "in the present case would not only protect the Plaintiffs from discrimination . . . but . . . would also protect the public's interest in preventing local governments and individuals from acting in a manner inconsistent with applicable law. Mem. in Supp. Pls.' Second Mo. Prelim. Inj. 7, ECF No. 38. In response, defendants argue that they have

---

[18] An "irreparable injury" is a harm that "cannot be adequately measured or compensated by money." Black's Law Dictionary 856 (9th ed. 2009). Thus, plaintiffs' property interest is not considered for purposes of this analysis. Constitutional violations, unlike monetary injuries, cannot be adequately remedied through damages and are considered. *See Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997).

9 – OPINION AND ORDER

"an interest in maintaining a commercial zone in their city to promote business."[19] Mem. in Supp. Defs.' Resp. to Pls.' Second Mot. Prelim. Inj. 11, ECF No. 47.

To begin, this Court recognizes that the scope of an injunction plays a significant role in this Court's public interest analysis. To the extent that plaintiffs seek a broad injunction against enforcement of GMO 03-2012 or COO requirements, this Court finds that such an injunction would carry the "potential for public consequences" and favors denial. *See, e.g.*, *Sammaratano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002). However, as to relief limited only to the parties, "the public interest [involving non-parties] will be at most a neutral factor." *Selecky*, 586 F.3d at 1139 (citations omitted) (quotation marks omitted). Accordingly, plaintiffs have met their public interest burden. *See supra* note 19.

## CONCLUSION

For these reasons, plaintiff's motion for preliminary injunctive relief (#37) is DENIED. In denying the plaintiffs' sought relief, this Court does not form an opinion about the ultimate merits of the case. This opinion is limited to the record before it. If future events surrounding foreclosure and eviction create a risk of irreparable harm, facts uncovered in discovery may allow the plaintiff's to raise the issue anew prior to trial.

IT IS SO ORDERED.

DATED this 16th day of January, 2014.

---

[19] This Court finds, based upon the facts alleged, that plaintiffs meet their burden under this prong. Specifically, had this Court awarded an injunction, this Court's decision would have only enjoined foreclosure and eviction proceedings. At this point, the underlying issue with residential use is the formal COO requirement and inconsistency with GMO 03-2012. However, there is no indication that health or safety is an issue for residential use. Likewise, there is no indication from defendants that commercial tenants will face difficulty finding alternative commercial locations from which to do business.

10 – OPINION AND ORDER

_____s/ Michael J. McShane_____
Michael J. McShane
United States District Judge